In the Matter of **UNITED NETWORK, INC.** (formerly called **Jaymac, Inc.**), Debtor, Individually and as General Partner of United Network Company, a limited partnership, and United Network Company, a limited partnership, Debtor.

**No. 532, Docket 71–1861.**

United States Court of Appeals, Second Circuit.

Argued March 1, 1972.

Decided May 8, 1972.

William R. Glendon, New York City (Royall, Koegel & Wells, New York City, Joseph H. Spain and William Haney, III, New York City, with him on the brief), for United Network, Inc., appellee.

Edward L. Blanton, Jr., of Adelberg, Rudow & Blanton, Baltimore, Md. (Samuel Newfield, New York City, with him on the brief), for LewRon Television, Inc., appellant.

Before MURRAH,* KAUFMAN and OAKES, Circuit Judges.

MURRAH, Circuit Judge:

The claim and counterclaim in this Chapter XI reorganization proceeding arise out of a complicated contract between the debtor corporation and one of its creditors. The case ultimately turns on the interpretation of this contract and the applicability of § 7–101 of the New York General Obligations Law, McKinney's Consol.Laws, c. 24–a. Both the bankruptcy referee and the District Court gave controlling effect to the statute and granted judgment for the debtor corporation on the counterclaim. We affirm that judgment and modify judgment on the creditor's approved claim to allow items to be noted.

In the fall of 1966, D. H. Overmyer Leasing Co., Inc. (Overmyer), was planning to set up a fourth national television network. The network's first regular program was to be a two-hour variety show emanating from Las Vegas and featuring entertainers appearing in that city's night clubs. Overmyer arranged to rent the necessary color television cameras and related equipment from LewRon Television, Inc. (LewRon), and the parties entered into a written contract to that effect. The contract also provided for the reimbursement of salaries and expenses for technicians which LewRon was to supply for operation and maintenance of the equipment. LewRon agreed to deliver the equipment to Las Vegas in time for the network's scheduled starting date. Overmyer agreed to pay a rental fee of $17,000 for each week of a thirteen-week program cycle, amounting to a total contract price of $221,000. A deposit of $11,050 was paid to LewRon at the time the contract was signed and was to be applied to the last weekly rent payment when due. Overmyer had the right to delay the network's starting date for up to six months provided it notified LewRon of its election prior to February 15; otherwise, the weekly rental payments were due on the dates set forth in the original agreement. If the network should fail completely to go on the air, Overmyer was obligated to LewRon for the total $221,000, subject, of course, to any pay-

* Senior Judge of the Tenth Circuit Court of Appeals, sitting by designation.

ments which LewRon might receive from renting the equipment to another party.

As the February 15 deadline approached, Overmyer realized that it would be unable to meet the scheduled starting date and began to have serious doubts as to the feasibility of the entire project. It entered into negotiations with United Network, Inc. (United) for a sale of the network concept and existing contracts. United, however, was unwilling to risk as much as $221,000 on the possible failure of the network to go on the air. In order to facilitate the sale to United, Overmyer asked LewRon for alterations on the terms of their contract. Lengthy negotiations resulted in a rider significantly amending the original agreement.

According to the terms of the rider, Overmyer was given the right to terminate the contract upon seven days' notice, and its liability was limited to payments made or due on the effective date of termination. The rider was to become effective upon Overmyer's payment of $60,000 to LewRon, "said payment being the consideration for this rider." The rider also provided for a credit to Overmyer of $9,000 on the rental payment due during the tenth week of the thirteen-week cycle, and credits of $17,000 for each of the payments due during the final three weeks of that cycle. It is evident that these credits were designed to equal the $60,000 consideration which Overmyer became obligated to pay for the rider. The $11,050 deposit made by Overmyer in October, 1966, was to be "retained by LewRon for its own account unless this agreement is extended for an additional 13 week period, in which event said amount shall be credited against the $17,000 payment due for the first week of the second 13 week period." Finally, the agreement specifically provided that "in no event shall LewRon be required to refund any payments theretofore made to LewRon."

Subsequent to execution of the rider, Overmyer completed sale of the network to United and assigned all of its rights and obligations under the contract to United. The required $60,000 payment was made to LewRon by United. LewRon and United, thereafter, agreed to a month's delay in the network's starting date; the dates when the weekly rental payments would be due—and the credits upon those payments granted—were also changed accordingly. Additionally, United sought and received LewRon's assistance in assembling a technical staff to operate the facilities and agreed to pay LewRon a 10% override on the salaries of this staff.

LewRon delivered its equipment and technicians to Las Vegas and United began broadcasting the network show on May 1, 1967, and continued until June 2, 1967. Rental payments of $17,000 each were made to LewRon for the first three weeks of this period. Payments due May 22 and May 29 were not made. On the latter date LewRon sent telegrams to United reiterating previous requests for payment according to terms of the contract and stating: "Since we have had no response of any kind our only alternative is to deny you use of our facilities effective immediately." Despite this message, United continued to use the facilities for three more days. On June 1, LewRon sent telegrams to United and Overmyer requesting confirmation as to whether they had, in fact, elected to terminate the contract in accordance with its provisions. The following day Overmyer replied that it was exercising the right of termination which it retained under its assignment agreement with United. LewRon views this communication from Overmyer as the required seven days' advance notice, thus making the effective date of termination June 9.

United subsequently filed its petition for reorganization pursuant to Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., and LewRon filed a claim against United of $64,326.89. The claim consists of: (a) $51,000 for three weeks of rental payments (including the week ending June 9); and (b) $13,326.89 due LewRon for miscellaneous services rendered and expenses incurred pursuant to the various agreements between the parties (composed primarily of overtime

and living expenses for technical supervisors and the 10% override on salaries of the technical staff).

United denied owing anything other than two weeks' rental to LewRon and also filed a counterclaim for $71,050 against LewRon. The counterclaim was based on § 7–101 of the New York General Obligations Law [1] which provides that deposits and advance payments on rentals of personal property are to remain money of the party making such payment and must be held in trust for him by the party to whom it is paid and not commingled with other funds until such time as it is actually applied as payments or returned. United contends that the $11,050 and $60,000 payments due LewRon come within the provisions of § 7–101, that LewRon, consequently, became trustee for such funds, that those funds were commingled in violation of the statute, and that LewRon was statutorily forbidden to retain them under provisions of the contract allowing it to do so.

After hearing extensive testimony pertaining to both the claim and counterclaim, the bankruptcy referee made findings of fact and conclusions of law disallowing all of LewRon's claim except for the two weeks' rental admittedly unpaid and due, and sustaining United's counterclaim. The referee concluded that the contract was terminated by LewRon on May 29, rather than by Overmyer's telegram of June 2, that the seven days' advance notice provision did not, therefore, come into play, and that no rent was due for the week ending June 9. He grounded his disallowance of the $13,326.89 in miscellaneous claims on a ruling that sufficient proof had not been presented with regard to United's failure to pay charges for the expenses incurred and services rendered. The referee also ruled that LewRon's approved claim of $33,593.34 [2] could be used as a set-off against the trust funds due United, and issued judgment in favor of United in the sum of $37,456.66.

Upon review by the District Court, the referee's order was affirmed with a modification eliminating use of LewRon's approved claim as a set-off. [3]

## United's Counterclaim

Notwithstanding the rather involved factual background of this case, the primary issue, as we have seen, is simply whether the $11,050 and $60,000 payments to LewRon were in the nature of either security deposits or advance payments on a contract for the use or rental of personal property so as to bring them within the provisions of § 7–101 of the New York General Obligations Law. If the payments come within the statute's intended coverage it is clear that the trust funds were converted in violation of the

1. The contract expressly stated that it was to be "interpreted under the laws of the State of New York."

The New York General Obligations Law § 7–101 provides:

"1. Whenever money shall be deposited or advanced on a contract for the use or rental of personal property as security for performance of the contract or to be applied to payments upon such contract when due, such money, with interest accruing thereon, if any, until repaid or so applied, shall continue to be the money of the person making such deposit or advance and shall be a trust fund in the possession of the person with whom such deposit or advance shall be made and shall be deposited in a bank or trust company and shall not be mingled with other funds or become an asset of such trustee.

"2. Any provision of a contract whereby a person who has deposited or advanced money on a contract for the use or rental of personal property as security for the performance of the contract waives any provision of this section is absolutely void."

2. This sum consists of the two weeks' rental payments of $17,000 each, or $34,000 in the aggregate, less a small offset of $406.66, covering a credit which LewRon was found to owe United.

3. The District Court concluded that § 68 of the Bankruptcy Act, 11 U.S.C. § 108, does not authorize the set-off of debts against funds which are held in trust, such as the $71,050 involved here. LewRon does not appeal the District Court's decision on this point.

statute since they were admittedly commingled with LewRon's regular checking accounts.

For the first time on appeal LewRon asserts that this contract is primarily one for services rather than for the use or rental of personal property; hence, it is not within the purview of § 7–101. While a contract in which the supply of services was a substantial element might very well not come within the coverage of § 7–101, we think the record clearly indicates that the services provided for in this agreement were merely incidental to its equipment rental aspects. Although some minor services were performed—primarily those of the two supervisory technicians—the contract's foremost concern was with the use of television equipment costing approximately $1,250,000, and the bulk of the $17,000 payments was for the purpose of obtaining such use.

█ The more difficult question, of course, is whether the funds in question were paid to LewRon as security deposits or advance rental payments on the contract. The answer is, perhaps, clearer with regard to the $11,050 payment since it is specifically denominated a "deposit" in the original contract. The terms of the rider make no significant change in the character of this payment, but only provide for LewRon's right to retention of it unless the contract should be extended for a second thirteen-week cycle, in which case it was to be credited against a future rental installment. The $11,050 payment, therefore, clearly falls within the coverage of § 7–101, since the contract expressly refers to it as both a deposit and an advance on a future rental installment.

█ Although the language of the rider is not quite so specific with regard to the $60,000 payment, there can be no doubt that it, too, is an advance to be applied to future rents due. After requiring payment of the $60,000 as consideration, the rider provides for credits totaling $60,000 to be extended to the last four rental installments due under the contract. To say that the $60,000

was not within the coverage of § 7–101 because the rider failed to specifically so state, would unduly emphasize form over the substance of the contractual language. LewRon urges that 34 W. 34th St. Corp. v. Nehama Realty Corp., 7 Misc. 2d 532, 153 N.Y.S.2d 427 (1956), and In re Dilbert's Leasing & Development Corp., 345 F.2d 172 (2d Cir. 1965), compel this result; but we cannot agree. The agreement in the *34 W. 34th St.* case is certainly distinguishable from the present one, inasmuch as it did not in any way provide for the payment in question to be applied as credits on particular rental payments otherwise due. The language of *In re Dilbert's* is not persuasive on the issue here, simply because § 7–101 was not invoked or relied upon by the parties in that case.

We must also disagree with LewRon's arguments that other provisions of the rider overcome any references to or representations of these funds as security deposits or advance payments. Invoking language of the rider, LewRon says that the $60,000 payment is "consideration for this rider" and, as such, could not be a security deposit or advance payment which would have to be held in trust. By entering into the rider LewRon, unquestionably, gave up substantial benefits which had accrued under the original contract, and the $60,000 was paid in consideration of its relinquishment of those benefits. The rider did not stop at describing the $60,000 payment as consideration, however, but went on to provide for its application to future rental installments. There is nothing to prevent a consideration being paid in the form of a deposit or advance on future liabilities so as to come under § 7–101, and it is clear to us that this is precisely what the parties intended and what the rider provided for in this case.

LewRon also contends that the funds cannot be viewed as advance rental payments within the statute's coverage because their application to future liabilities was subject to the occurrence of a condition precedent; *i. e.*, that the lease not be terminated prior to the dates

designated for such application of the funds. But the fact that the funds were not to be "applied" until occurrence of a condition precedent does not affect their status as advance payments. Any advance payment is, by its very nature, in some respects subject to a condition precedent—usually the maturing of an anticipated obligation. The manifest purpose of § 7–101 is to require that such funds be held in trust during the interim between their initial payment and their actual application to liabilities. If the funds could be commingled until occurrence of the condition precedent calling for their application, this statutory purpose would be subverted.

■■ Nor can the contract's statement that "in no event shall LewRon be required to refund any payments theretofore made to LewRon," be given the effect of removing the $71,050 fund from the statute's coverage; especially since § 7–101(2) voids any attempt to waive the statute's provisions. The parties' intentions concerning disposition of the funds in the event the contract was terminated are irrelevant to the issue before us. What is relevant is that if the contract had run its full course the funds were to be applied as advance payments, and the statute requires that as advance payments they were to be held in trust in a segregated account. United claims these funds under the statute—not under the contract. By commingling the $71,050, LewRon converted trust funds to its own use in violation of the statute and is obligated to repay them to United, regardless of any contractual language to the contrary.

■ Finding the contract to be clear and unambiguous in its treatment of these funds as deposits or advance payments, we need not resort to the parol evidence elicited in testimony before the referee. Suffice it to say that a review of that testimony merely substantiates what we find to be clear on the face of the contract. It is enough that the parties treated the $71,050 as advance rental payments on their account books and in their business dealings with others. Inasmuch as neither party had a full awareness of the provisions of § 7–101 during the life of the contract, such treatment must be viewed as free of any ulterior motivation and as a valid indication of the parties' intentions with regard to these payments. The order granting the counterclaim is accordingly affirmed.

### Rental Payments Due Under the Contract

■ The referee found that LewRon's action in sending its telegram of May 29 to United, and in removing its equipment on June 2, constituted a termination of the rental agreement effective as of June 2. The telegram's statement that LewRon intended to deny United the use of its facilities "effective immediately," and the subsequent removal of those facilities, certainly afforded a reasonable basis for the conclusion that the termination was by LewRon, rather than by Overmyer's belated message of June 2. United was, thus, under no obligation to pay rent after the equipment was removed, and the determination that only two weeks' rent is owed by United must be affirmed.

### The Miscellaneous Charges

In order to substantiate its claim for miscellaneous expenses incurred and services rendered pursuant to the contract, LewRon submitted several invoices which had been presented to United between the dates of May 4 and June 5. In contravention of this claim United submitted several cancelled checks made payable to LewRon and various other parties, asserting that these constituted full payment of the invoiced charges. The referee held that LewRon had not presented sufficient evidence that payments had not been made on these charges. We think that conclusion is erroneous.

■ The checks submitted by United were never connected with the specific charges for which they purportedly constituted payment. Indeed, it is doubtful that such connections could have been made since all but two of the checks were dated prior to the earliest invoice. Of those two checks, one, in the amount of

$2,757.28, was dated May 5, while the other, in the amount of $18,227.83, was dated May 11. The record reveals that $17,000 of the latter check was in payment of the weekly rental. It appears, therefore, that of the amounts reflected by United's checks only $3,985.11 could possibly have been in payment of the charges shown on the invoices, and even that amount has not been connected as payment for any specific charges. We think that LewRon has substantiated a claim of $13,326.89 for miscellaneous expenses incurred and services rendered and that, notwithstanding ample opportunity, no clear proof of payment for any of these charges was presented. LewRon's approved claim should be increased in the amount of $13,326.89.

We agree, however, with the referee's ruling that United incurred labor charges in the amount of $406.66 in connection with a changeover in the cameras furnished by LewRon and that this expense was chargeable to LewRon under terms of the contract. This amount was properly included as an offset against LewRon's approved claim.

The order is accordingly modified to include miscellaneous charges in the sum of $13,326.89, and as so modified affirmed.