**Elmer BERNSTEIN et al., Plaintiffs,**

v.

**UNIVERSAL PICTURES, INC., et al.,
Defendants.**

**No. 72 Civ. 542–CLB.**

United States District Court,
S. D. New York.

June 28, 1974.

---

Battle, Fowler, Lidstone, Jaffin, Pierce & Kheel, New York City, for plaintiffs.

Donovan, Leisure, Newton & Irvine, New York City, for defendant Walt Disney Productions, Inc.

Shea, Gould, Climenko & Kramer, New York City, for defendant Metro Goldwyn Mayer, Inc.

Cahill, Gordon & Reindel, New York City, for defendant Nat'l Broadcasting Co., Inc.

Hawkins, Delafield & Wood, New York City, for defendant American Broadcasting Companies Inc.

Simpson, Thacher & Bartlett, New York City, for defendants Gulf & Western Industries, Inc. & Paramount Pictures Corp., & MCA, Inc. & Universal City Studios, Inc.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants Warner Bros., Inc., & Warner Communications, Inc. & Columbia Pictures Inc., & Transamerica Corp., Twentieth Century Fox Film Corp., United Artists Corp. and Assoc. of Motion Pictures & Television Producers, Inc.

## MEMORANDUM

BRIEANT, District Judge.

This class action was commenced on February 7, 1972 by 71 composers and lyricists as named party plaintiffs. These authors and composers of original words and music for motion picture and television films sue on behalf of themselves, and all others similarly situated. Defendants are motion picture and television producers. The Association of Motion Picture and Television Producers, Inc. (hereinafter "AMPTP"), a trade association to which most of the defendants belong, has been dismissed as a defendant by stipulation.

Plaintiffs invoke our jurisdiction under §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), to secure injunctive relief and damages for alleged antitrust violations.

An order of this Court dated June 18, 1973 determined, conditionally, that this litigation be maintained as a class action pursuant to Rule 23(b)(1), F.R.Civ.P.

A further order dated October 5, 1973 defined the class as:

> "all composers and lyricists, and in the case of deceased composers and lyricists, their representatives, who have composed music and/or lyrics for any of the defendants for motion pictures and television shows. . . ."[1]

The complaint alleges that defendants, acting in concert, refuse to contract for the services of composers,[2] except upon certain standard terms and conditions imposed upon them by the defendants, and that the imposition of these terms by the defendants is part of a conspiracy aimed at monopolizing the (sheet) music publishing industry by preventing plaintiffs and others from entering the industry, in violation of the antitrust laws.

The standard terms referred to are contained in agreements between defendant producers and composers. In essence, these terms relate to ownership by producers of copyrights of the compositions created by the composers for motion picture and television sound tracks.[3]

The named plaintiffs are all members of the Composers and Lyricists Guild of America, Inc. ("CLGA"), which was formed in 1954, as are most of the members of the plaintiff class. Notice of the pendency of this action, and an invitation to join as parties plaintiff was sent to all 427 members of CLGA, except the 71 plaintiffs. Some 291 members did not reply or replied negatively. Approximately 65 responded affirmatively, but the record shows no additional plaintiffs intervened or asked to be listed as plaintiffs.

In July 1973, plaintiffs moved pursuant to Rules 12(f), 56 and 65 for an order:

> "striking, or in the alternative, granting summary judgment dismissing defendants' affirmative defenses based on (1) the labor exemption of the antitrust laws, and (2) the claim of primary and exclusive National Labor Relations Board jurisdiction, and for an order enjoining defendants during the pendency (sic) of this action from imposing upon plaintiffs standard terms regarding the right to publish and exploit plaintiffs' musical compositions or from making any contracts having the effect of restraining plaintiffs from making use of their musical compositions or surrendering to defendants the copyrights in said musical compositions. . . ."

1. The order dated October 5, 1973 made the following direction with respect to notice to the class:

"FURTHER ORDERED that counsel for plaintiffs and defendants shall compile a list of those composers and lyricists who are included in the above described class and to whom notice of pendency of this action shall be sent, and it is
FURTHER ORDERED that notice of pendency of this action in the form annexed to this Order shall be mailed to members of the class, and it is
FURTHER ORDERED that the notice of pendency of this action shall be published once weekly for two consecutive weeks in the weekly edition of 'Variety', and it is
FURTHER ORDERED that this Order may be altered or amended by the Court as may be desirable from time to time."
Pursuant to the October order, notice of pendency of this action was published in Variety and was sent by mail to members of the class, approximately 1,000 persons, on January 22 and 23, 1974. About 155 notices were returned undelivered by the post office and to date, some 50 class members have asked to be excluded.

2. The term "composers" as used hereinafter shall include lyricists.

3. Essentially, the composers seek unilateral power to exploit their compositions by use elsewhere than in the sound tracks, e. g., by sale of sheet music and phonograph records. In the last industry-wide contract with AMPTP, which expired on November 30, 1971, ownership of the copyright by the employer was agreed to, but substantial rights to deal with the composition were granted to the employee. These included publication royalties at various rates, and the right to repurchase from the employer certain unused theme music and songs at employer's cost, after five years. (Articles 13, 20(b)(7) and 21 of 1967 Minimum Basic Agreement, Exhibit 21 to Affidavit of Simon Rose, Esq., sworn to November 20, 1973).

The motion was heard on February 28, 1974.

█ A motion for summary judgment seeking dismissal of affirmative defenses is clearly improper, and therefore relief pursuant to Rule 56 must be denied plaintiffs.

"[I]t is difficult to see how the elimination of [an] affirmative defense could lead to any judgment, summary or otherwise. It would merely narrow the area of dispute; and the Rules do not appear to contemplate the use of the summary judgment procedure in situations such as the present one." Seacoast Liquor Distributors, Inc. v. Kips Bay Brewing Co., Inc., 8 F.R.D. 74, 75 (S.D.N.Y.1947).

In Old Dutch Farms, Inc. v. Milk Driv. & Dairy Emp. Loc. U. No. 584, 281 F. Supp. 971 (E.D.N.Y.1968), the Court considered a motion for summary judgment brought pursuant to Rule 56 to dismiss affirmative defenses as a motion to strike under Rule 12(f), stating:

"Although at one time the proper procedure for raising objection to the sufficiency of a defense troubled some courts, it seems that the 1946 amendment to Rule 12(f) was designed to provide a specific method of raising such a challenge." 281 F.Supp. at pp. 975–976.

Rule 12(f) reads in pertinent part as follows:

"[U]pon motion made by a party within 20 days after the service of the pleading upon him or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense. . . ."

Treated as a Rule 12(f) motion, plaintiffs' request to strike affirmative defenses is untimely. But, Rule 12(f) also provides that the Court on its "own initiative" may grant the relief requested. In view of the age of this litigation, and the voluminous papers presented, we now consider whether that initiative should be exercised.

*Historical Background of the Controversy.*

Since about 1928, when the use of sound in motion pictures became commonplace, producers have hired composers to compose words and music for films under contracts describing them as "employees". With some exceptions, until the early or mid-1950's most major motion picture producing companies, or "studios" had regularly employed staff composers working directly for the studio as salaried employees using employer facilities. In the early or mid-1950's, the producers began phasing out their staffs of regularly employed composers. Since then, studios or producers have hired composers, pursuant to written agreements, for single motion pictures or television productions. (Affidavit of Ted Cain, sworn to July 17, 1973).

Apparently in response to this change in business methods, the Composers and Lyricists Guild of America, Inc. was formed to represent its composer members in negotiations with individual producers and also with respect to industry wide bargaining with their trade association, AMPTP. On August 19, 1955, after an election held by the National Labor Relations Board ("NLRB"), CLGA was certified as the exclusive representative "of all the employees in the unit . . . for the purposes of collective bargaining. . . . ," with individual movie producers and the AMPTP as a multi-employer unit. (NLRB Certification, Exhibit 1 to Affidavit of Simon Rose, Esq., sworn to November 20, 1973).

Bargaining between CLGA and AMPTP resulted in three successive collective bargaining agreements, each entitled "Minimum Basic Agreement," signed in 1960, 1965 and 1967 (Exhibits 19, 20 and 21 to Rose Affidavit of November 20, 1973).[4] Each of the indus-

---

4. CLGA was not certified as bargaining representative with respect to those defendants who operate television networks. These defendants do not belong to AMPTP, nor have they engaged in the collective bargaining which took place between AMPTP and CLGA. The network defendants for the most part will grant the composers the dis-

try wide collective bargaining agreements fixed minimum terms binding on the employer members of AMPTP, but the agreements left composers free to negotiate other or different terms, so long as the terms of each individual contract were at least as favorable to the composer as those contained in the basic agreement.[5]

Article 10 of the 1965 and 1967 agreements provides:

> "This agreement applies to and is incorporated into the provisions of each individual contract between the employer and a composer with respect to services subject to this agreement, and such individual contract shall contain a statement to such effect."

In addition to other terms, including a minimum wage scale, each agreement provided for division of the rights embraced in the copyright to the music written while employed. The composers' share in these rights, along with the scale of minimum wages, increased with each agreement, but the producers in the course of the collective bargaining main-

tained a consistent position of refusal to accede to CLGA's demand for ownership of the copyrights by the individual composers.

After several extensions, the 1967 Basic Agreement expired on November 30, 1971 (Affidavit of Abraham Marcus, Esq., sworn to July 17, 1973). Thereafter, a number of bargaining sessions were held in an effort to negotiate a new industry-wide contract. Negotiations were unsuccessful. A CLGA press release announced on November 15, 1971 that "negotiations with the AMPTP reached an impasse . . . on the issue of Copyright ownership." This and other requests having been denied, CLGA felt it had "no other choice, but to recommend a work stoppage [i. e., a strike]." (Exhibit 25 to Affidavit of Simon Rose, Esq., sworn to November 20, 1973).

At midnight on November 30, 1971, the CLGA called out its members on strike against producer members of the AMPTP. Simultaneously CLGA filed an unfair labor practice charge against

---

puted copyright interests upon request, and upon demand by CLGA, have agreed to incorporate in their contracts with CLGA composers certain terms contained in the Minimum Basic Agreements. For example, in response to the usual kind of coercion applied in labor negotiations, here taking the form of a telegram advising that CLGA members would not perform any further services for NBC unless a minimum contract was agreed upon between NBC and CLGA (Exhibit A to Affidavit of Richard N. Goldstein, sworn to January 15, 1974), NBC entered into an agreement with the union. By letter dated March 19, 1969 (Exhibit B to Goldstein Affidavit of January 16, 1974), NBC obligated itself to incorporate in its contracts with CLGA members the substance of provisions of the CLGA–AMPTP agreement setting minimum wage rates, providing for pension fund payments and granting rights arising from copyright ownership, but retaining the right to employ non-CLGA composers on other terms. As NBC correctly points out, if CLGA is not a labor union and its members are not employees, such conduct would itself violate the antitrust laws (NBC Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and a Preliminary Injunction, p. 4, et seq.).

The parties agree that this motion is not addressed to CBS because by stipulation CBS has not yet answered and its defenses obviously are not yet known.

5. The CLGA established procedures to review each such contract to ascertain if in fact the special provisions negotiated by a particular composer were more favorable. See, e. g., Article 9 of the 1965 Minimum Basic Agreement:
  > "*Delivery of Contracts*
  > Producer agrees that from and after the effective date hereof, upon the employment of any composer, such composer shall be tendered, within a reasonable length of time a written contract. Within two weeks after such written employment contract has been fully signed, a copy thereof shall be delivered to the composer and a copy to the Guild . . . ."
This type of labor agreement is quite commonplace in situations involving "talent." See for example the labor agreements affecting the radio and television networks, Evans v. American Federation of Television & Radio Artists, 354 F.Supp. 823, 828, 848 (S.D.N.Y.1973), rev'd, Docket No. 73–1667, 496 F.2d 305 (2d Cir. 1974).

AMPTP, alleging that "since on or about November 8, 1971, and at all times since that date [AMPTP] refused to bargain in good faith . . . . These acts of refusal have also taken the form of discriminatory conduct against employees . . . in violation of 8(a)(3) of the [National Labor Relations] Act, thereby discouraging membership in the union." (Exhibit A to Affidavit of Charles Boren, sworn to November 20, 1973).

AMPTP also filed an unfair labor practices charge against CLGA on November 30, 1971, alleging, *inter alia,* that the union had bargained to impasse and was striking over an issue [the copyrights], not a mandatory subject of collective bargaining, and had done so without giving the notice required by § 8(d) of the Act. On June 15, 1972, the Regional Director of the NLRB advised AMPTP's attorney that the Board would not issue a complaint based on its unfair labor practice charge because the copyright issue was "a mandatory subject of bargaining within the meaning of § 8(d) of the Act under the test of *Borg-Warner*, 356 U.S. 342 [78 S.Ct. 718, 2 L.Ed.2d 823] (1958), as it involves the relationship between employer and employee, and settles a 'term and condition' of employment, i. e., the total compensation accruing to the composers from their unit work." (Exhibit E to Affidavit of Charles Boren, sworn to November 20, 1973).

The CLGA strike was unsuccessful. During December 1971 and January 1972, a representative of the Federal Mediation Service convened meetings with CLGA and AMPTP representatives. No agreement was reached. (Affidavit of Charles Boren, sworn to November 20, 1973). No further negotiations have taken place and none are contemplated. (Affidavit of Abraham Marcus, Esq., sworn to July 11, 1973).

According to a CLGA press release, institution of this action "was approved at a general membership meeting yesterday [January 31, 1972] . . . . * * * This unprecedented action shifts the composers and lyricists struggle for ownership of all of their [copy] rights from the labor to the legal arena." (Exhibit 27 to Affidavit of Simon, Rose, Esq., sworn to November 20, 1973).[6] This action was filed seven days later, and on March 7, 1972, CLGA withdrew its unfair labor practice charge against AMPTP. (Affidavit of Charles Boren, sworn to November 20, 1973).

█ The labor union, for so it has represented itself to be for the past 20 years, cannot remove jurisdiction from the National Labor Relations Board and confer it upon this Court by the simple expedients of a membership vote and the commencement by its then President of this class action litigation couched in antitrust terms, followed by withdrawal of its unfair labor practice charges. In view of the undisputed history of the underlying disagreement, the plaintiffs' claim that they are now and always have been independent contractors, rather than union members or employees, is regarded as mere sophistry, and an exercise in shifting nomenclature contrived in order to sustain this lawsuit.

*Plaintiffs' Theory of Antitrust Violation.*

The claimed antitrust violation seems to depend upon the concept that there is something sinister, unlawful and conspiratorial about defendants refusal to disgorge, and turn over to plaintiffs, ownership of existing or future copyrights in plaintiffs' musical compositions created for defendants' films to which copyrights plaintiffs believe they

---

6. At this same meeting, the union exhibited its continued vitality as the composers' representative by voting on the terms upon which its members would work for producer employers and, in a letter to the Association dated February 2, 1972, informed the producers of those terms. (Exhibit 18 to Affidavit of Simon Rose, Esq., sworn to November 20, 1973).

have a right. Whatever kind of "right" they may have, it is not a legal right.

▇▇▇ The copyright laws were amended, effective October 15, 1971. Despite strenuous efforts by CLGA and others to convince Congress the existing law should be amended to eliminate the "work for hire doctrine," [17 U.S.C. § 26] the statute still provides, as it has at all material times, that: "(1) . . . the word 'author' shall include an employer in the case of works made for hire." The doctrine clearly applies when the relationship is that of employer-employee. It is equally applicable however, where the creator of the work is an independent contractor. See Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565 (2d Cir. 1966). The statute gives rise to a presumption of ownership of the copyright by the party who commissioned the work at his own instance and expense. This presumption controls in the absence of a showing of contrary intent, as by contractual terms. See Irving J. Dorfman Co. v. Borlan Industries, Inc., 309 F. Supp. 21, 23 (S.D.N.Y.1969). The "works for hire" doctrine and its applicability to independent contractors as well as employees was reaffirmed in Picture Music Inc. v. Bourne, Inc., 457 F.2d 1213 (2d Cir. 1972), cert. denied, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1973).

▇▇▇ Whether the plaintiffs be considered employees or independent contractors, the producers had a statutory right to ownership of copyrights to musical compositions they commissioned. The mere refusal of the producers to give up the right conferred by the Congress, and to do so pursuant to collective bargaining or otherwise, cannot be considered contrary to the antitrust or any other laws. Nor is the fact that some producers have done so by agreement evidence of an illegal conspiracy in restraint of trade.

*NLRB Jurisdiction.*

▇▇▇ The Court finds defendants' affirmative defense which pleads that primary and exclusive subject matter jurisdiction is vested in the National Labor Relations Board is sufficient as a matter of law. Plaintiffs' motion to dismiss this affirmative defense is denied, and, on its own motion, pursuant to Rule 12(h)(3), the Court must dismiss the complaint. Rule 12(h)(3) provides:

> "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."

From the facts outlined above, it is clear that this action arises out of a labor dispute over which the NLRB has exclusive jurisdiction. Even though the complaint alleges violations of the antitrust laws, the issue is essentially a refusal by the defendants to bargain regarding copyright ownership, which, if proven, is an unfair labor practice as defined in § 8(a)(5) of the National Labor Relations Act [29 U.S.C. § 158(a)(5)]. Section 8(a)(5) refers to § 159(a), which in turn compels collective bargaining:

> " . . . in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ."

In a recent decision enlarging the exclusive jurisdiction of the NLRB, our Court of Appeals held in Buckley v. Amer. Federation of Television and Radio Artists, Docket No. 73–1667, 496 F. 2d 305, p. 312 (2d Cir. 1974):

> "Although [the complaint] do[es] not explicitly allege violations of §§ 8(a)(3) and 8(b)(2) [footnote omitted], [it does] aver the commission of acts which we find are 'arguable' unfair labor practices under . . . the NLRA. When unfair labor practices are alleged 'the federal courts must defer to the exclusive competence of the National Labor Relations Board.' San Diego Building Trades Council v. Garman [359 U.S. 236 (1959)] at 245 [79 S.Ct. 773, 3 L.Ed. 775]; accord Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge, 403 U.S. 274, [91 S.Ct. 1909, 29 L.Ed.2d 473] (1971)."

The test announced in *Buckley* turns on whether the factual conduct, however it may be pleaded in the complaint, is "arguably violative of § 8, as it must be for the jurisdiction of a federal court to be preempted," *Buckley, supra,* at 496 F.2d at p. 312, footnote 4. Plaintiffs in *Buckley,* political commentators, had been compelled to join a union, and submit to union discipline as a condition of employment in radio and television, which had a chilling effect on the exercise of their First Amendment rights. The Court of Appeals held that any union attempt to enforce written contracts requiring employers to discharge plaintiffs for resigning from the union would "arguably" violate NLRA §§ 8(a)(3) and 8(b)(2), and therefore would be within the exclusive jurisdiction of the NLRB. *Buckley, supra,* 496 F.2d at p. 312.

As we have pointed out, the issue in this case is "arguably" a violation of NLRA § 8(a)(5), and possibly of § 8(a)(3),[7] as CLGA originally claimed in its unfair labor practice charge, since withdrawn. It is of no consequence that plaintiffs claim the same conduct also violated the antitrust laws. If the NLRA is properly construed, as it was in *Buckley, supra,* to grant exclusive subject matter jurisdiction to the Board, of a claim arising under the First Amendment ("a profound national commitment" [New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1963)]) simply because the factual context in which the claim arises is "arguably" also an unfair labor practice, then *a fortiori* it is not anomalous for us to reach the same conclusion as to the claims here pleaded.[8] Plaintiffs' "selection of forum was incorrect," *Buckley, supra,* 496 F.2d at p. 313. Amalgamed &c Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).

Since the Court lacks jurisdiction over the subject matter of this action, granting a preliminary injunction would be improper, and we do not reach the merits of plaintiff's motion for that relief, nor need we discuss the affirmative defenses based on the labor exemption in the antitrust laws.

*Effect of this Determination on the Class.*

As noted, the class conditionally declared here includes all composers, and the personal representatives of those who may be deceased, who were ever employed for motion pictures since Al Jolson first sang "Mammy" in *The Jazz Singer.*[9] The earliest date for which we find Congressional pre-emption is July 5, 1935. It is more than likely that by February 7, 1972 the statute of limitations had expired as to all antitrust claims by any members of the purported class, accrued prior to July 5, 1935.

The determination made herein is without prejudice to the rights of those composers, if any, whose claims arose before pre-emption and are not time barred. All such persons, if any there be, should be and are excluded from the class.

Plaintiffs' motion is in all respects denied, and the complaint is dismissed.

Settle Order on Notice.

---

7. Section 8(a)(3) [29 U.S.C. § 158(a)(3)] reads in pertinent part:
    "(a) It shall be an unfair labor practice for an employer—
    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . ."

8. Judge Friendly's concurring opinion in *Buckley* expressed the view that *constitutional* claims could be raised in the District Court. But no such claim is pleaded here.

9. Although short features with sound were produced as long ago as 1922, Jolson's effort (1927) was the first complete talkie.