**UNIROYAL, INC., Plaintiff,**

v.

**William HELLER, Individually and as Co-Trustee for Kathy Rosenbloom under Agreement dated November 6, 1957, and as Co-Trustee for David A. Rosenbloom under Agreement dated November 6, 1957, et al., Defendants.**

**No. 73 Civ. 3101–CLB.**

United States District Court, S. D. New York.

Oct. 16, 1974.

Walter Barthold, William C. Whittemore, III, Arthur, Dry & Kalish, New York City, for plaintiff.

John C. Fleming, Jr., Richard L. Feller, Willkie, Farr & Gallagher, New York City, for defendants.

## MEMORANDUM DECISION

BRIEANT, District Judge.

Pursuant to an Agreement dated April 9, 1965 (the "Agreement") with plaintiff Uniroyal, Inc. ("Uniroyal"), the defendants exchanged all of the stock of William Heller, Inc. for shares of plaintiff's predecessor, United States Rubber Company. An initial closing took place in 1965. The Agreement provided that additional Uniroyal shares would be transferred to defendants at "Subsequent Closings" during the succeeding five years in accordance with a formula, provided that William Heller, Inc. and its subsidiaries (the "Acquired Companies") had specified net operating income.

The Agreement contemplated the possibility that Uniroyal would establish a pension plan covering certain employees of the Acquired Companies. It provided that if such a pension plan were established, defendants would be obligated to make payments toward its funding. The Agreement also provided that ¶ 18):

"... if a pension plan has not been so provided for such persons prior to the final Subsequent Closing, at such final Subsequent Closing, the defendant Shareholders shall, *pro rata*, in such percentages, pay to Uniroyal $70,000."

Uniroyal commenced this action on July 12, 1973 to recover from defendants the sum of $70,000.00 allegedly due under that paragraph of the Agreement. Defendants, in their answers, deny the allegations of the complaint, assert a counterclaim and plead numerous affirmative defenses.

■■ Uniroyal moved for an order, pursuant to Rule 12, F.R.Civ.P., dismissing certain affirmative defenses, and for "partial summary judgment," pursuant to Rule 56, F.R.Civ.P., dismissing other affirmative defenses. A motion for partial summary judgment seeking dismissal of an affirmative defense is improper here, although commonplace under New York practice. CPLR § 3212(e). Accordingly, relief pursuant to Rule 56 must be denied. Bernstein v. Universal Pictures, Inc., 379 F.Supp. 933, 72 Civ. 542 (S.D.N.Y.1974). Treating the entire motion as under Rule 12(f) to strike affirmative defenses, it is untimely, since not made within twenty days after service of the answers. However, Rule 12(f) provides that the Court on its "own motion" may consider the relief requested. In view of the substantial pre-trial discovery which has already been conducted, it appears appropriate to do so.

## *Subject Matter Jurisdiction.*

Plaintiff invokes our jurisdiction on the basis of diversity of citizenship. 28 U.S.C. § 1332. Defendants contend that plaintiff Uniroyal, a New Jersey corporation, has its principal place of business in New York. 28 U.S.C. § 1332(c). If so, since defendant Benjamin Heller is a citizen of New York, diversity would be absent. Uniroyal maintains that its principal place of business is at Middlebury, Connecticut.

■■ Plaintiff is a vertically integrated manufacturing corporation having substantial activities in many states. The location of its principal place of business is a question of fact. A corporation's principal place of business is usually considered as being at its "nerve center," that location "from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in furtherance of the corporate objective." Scot Typewriter Co. v. Underwood Corp., 170 F.Supp. 862, 865 (S.D.N.Y.1959). See also Chu v. Plastic Systems Corp., 308 F.Supp. 1189 (S.D.N.Y.1969); Wear-Ever Aluminum, Inc. v. Sipos, 184 F.Supp. 364 (S.D.N.Y. 1960). Also relevant is identification of

that state which "contains a substantial predominance of corporate operations, including personnel", although overall direction and control may be located elsewhere. Inland Rubber Corp. v. Triple A Tire Service, Inc., 220 F.Supp. 490 (S.D.N.Y.1963).

Uniroyal's Board of Directors usually meets in New York City, but has on occasion met at Middlebury, Connecticut. The Chairman and Vice Chairman of the Board and the President and the Financial Vice President maintain offices both in New York City and Connecticut. Five other Vice Presidents have their offices in Connecticut; another is located in South Carolina. The Corporate Secretary has his office in Connecticut; one Assistant Secretary is in Connecticut, the other is in New York. The Operating Policy Committee, a group of key executives, meets monthly in Connecticut. Seven of Uniroyal's eight domestic operating divisions have their headquarters in Connecticut; the eighth is in South Carolina.

Uniroyal has 1,387 managerial and supervisory employees [1] in Connecticut but only 65 of such employees are employed in New York. Uniroyal has 2,557 salaried employees [a larger category than that last mentioned], in Connecticut, more than in any other state, compared with 130 such employees in New York. Uniroyal owns more than 2,600 acres of land in Connecticut, but owns no real estate in New York, except for the homes of certain employees. (Affidavit of Mr. William J. Palmer, sworn to March 21, 1974).

■ Defendants contend that Uniroyal's designation of a New York City address as the site of its principal executive offices on certain forms required to be filed with the Securities and Exchange Commission constitutes an admission foreclosing this issue. Although significant, such designation is not dis-

positive of the issue. Kelly v. United States Steel Corporation, 284 F.2d 850 (3rd Cir. 1960) holds that United States Steel Corporation, which filed its income tax returns in New York, nevertheless had its principal place of business in Pennsylvania, since it had more key personnel in that state, and its Operations Policy Committee met there.

■ Based on the foregoing analysis, it appears that Connecticut is Uniroyal's principal place of business, and therefore, complete diversity of citizenship exists in the action.

■ Defendants next contend that several of the claims do not satisfy the requisite jurisdictional amount. The claims against William Heller, Rose Heller and Benjamin Heller, in their personal capacities, each exceed the requisite jurisdictional amount. The claims against them and Irvin A. Levinson, in their representative capacities as trustees under various trust agreements, and against defendants Naomi Rosenbloom and Judith Heller are less than $10,000.-00 each. Uniroyal characterizes its claim as being but a single claim against the selling shareholders as a group, and contends that as such, it satisfies the jurisdictional requirements.

In suits involving multiple defendants where federal jurisdiction is premised on diversity of citizenship, the rule has been stated as follows:

"Where two or more defendants are joined by the same plaintiff in one suit, the pecuniary test of jurisdiction ordinarily turns on whether the defendants' liability to plaintiff is joint or several. If their liability to plaintiff is joint or integrated, the value of the matters in controversy between them and the plaintiff is the jurisdictional sum . . . .

If liability is several, ordinarily the suit can be sustained only as against

---

1. The designation as managerial and supervisory employees, for this purpose, includes those employees who are exempt from the

Fair Labor Standards Act. See Kelly v. United States Steel Corp., 284 F.2d 850 (3rd Cir. 1960).

those whose respective controversies individually involve matters exceeding the jurisdictional amount." 1 J. W. Moore, Federal Practice ¶ 0.97[2], at 886–88.

In this case, liability of the defendants is several. Paragraph 18 of the Agreement, imposing the obligation at issue, provides that "the [defendant] Shareholders shall, *pro rata*, in such percentages [as indicated in a document appended to and incorporated in the Agreement], pay to Uniroyal $70,000." The apportionment of liability, if any, has been resolved as a matter of contract and plaintiff is merely seeking recovery of these separate amounts totalling $70,000.00. Smith v. Abbate, 201 F. Supp. 105 (S.D.N.Y.1961). Each defendant's liability under this *pro rata* apportionment clause is distinct and independent.

Uniroyal contends that, since its case against all of the defendants emanates from the same clause of the same contract and since it cannot prevail on the merits against some of the defendants without succeeding against all, it states but one cause of action. In Thomson v. Gaskill, 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951 (1942), the Supreme Court rejected a similar argument. The Supreme Court stated

> "Aggregation of plaintiffs' claims cannot be made merely because the claims are derived from a single instrument . . ., or because the plaintiffs have a community of interest . . . . In a diversity litigation the value of the 'matter in controversy' is measured not by the monetary result of determining the principle involved, but its pecuniary consequence to those involved in the litigation." 315 U.S. at 447, 62 S.Ct. at 675 (Citations omitted).

See Motorists Mutual Insurance Company v. Simpson, 404 F.2d 511 (7th Cir. 1968), cert. denied, 394 U.S. 988, 89 S.Ct. 1470, 22 L.Ed.2d 763 (1969).

Alternatively, Uniroyal contends that since three claims do satisfy the jurisdictional statute, it ought to be permitted to pursue its claims against these same defendants in their representative capacities and against the other defendants in a single forum.

In Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), the Supreme Court held that in a class action brought on diversity jurisdiction under 28 U.S.C. § 1332, each plaintiff in the class must satisfy the jurisdictional amount requirement of the statute. The Court interpreted that statute as requiring the "dismissal of those litigants whose claims do not satisfy the jurisdictional amount, even though other litigants assert claims sufficient to invoke the jurisdiction of the federal court." 414 U.S. at 295, 94 S.Ct. at 509. If, instead of claims by a single plaintiff against multiple defendants this case involved the claims of multiple plaintiffs against a single defendant, *Zahn* would control our decision. See also Hylte Bruks Aktiebolag v. Babcock & Wilcox Company, 305 F.Supp. 803 (S.D.N.Y.1969).

■■■ However, the case at bar is distinguishable, and considerations of judicial economy and fairness invite exercise of ancillary jurisdiction. In determining whether such jurisdiction should be exercised, two distinct inquiries are presented: first, whether the Court has the power to hear the ancillary claim, and, second, whether, if so, the Court should exercise its discretion and hear that claim. Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971). Judicial power exists whenever the relationship between the jurisdiction conferring claim and the ancillary claim "permits the conclusion that the entire action before the court comprises but one constitutional 'case'." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d

218 (1966). The claim conferring jurisdiction and the ancillary claim:

"must derive from a common nucleus of operative fact. But if, considered without regard to [jurisdictional considerations], a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the [jurisdiction conferring] issues, there is *power* in federal courts to hear the whole." 383 U.S. at 725, 86 S.Ct. at 1138.

The justification for the exercise of this power "lies in considerations of judicial economy, convenience and fairness to litigants." 383 U.S. at 726, 86 S.Ct. at 1139. In the instant case, the issues and facts pertaining to the claims against all of the defendants are identical.

In Beautytuft, Inc. v. Factory Insurance Association, 431 F.2d 1122 (6th Cir. 1970), the Sixth Circuit held that the District Court properly asserted its "pendent" jurisdiction to adjudicate the claims against 34 insurance companies, all of which arose from a single fire, even though only the claims against ten defendants satisfied the jurisdictional amount requirement of 28 U.S.C. § 1332. The Court noted that:

"[a]s to the 24 defendants with lesser limits on their liability, the claims arose out of the same transaction and the proofs required (except as to amount of liability) are identical in every respect. Clearly, in the interest of avoiding sheer waste of court time, these claims should be tried together." 431 F.2d at 1128.

See also, General Research, Inc. v. American Employers' Insurance Company, 289 F.Supp. 735 (W.D.Mich.1968). Stone v. Stone, 405 F.2d 94 (4th Cir. 1968) similarly held that the District Court should have exercised its jurisdiction and adjudicated the entire dispute between family members over the assets of two trusts which had been established for a common purpose although the claims against one of the defendants did not satisfy the jurisdictional minimum. See also, Jacobson v. Atlantic City Hospital, 392 F.2d 149 (3rd Cir. 1968); Hatridge v. Aetna Casualty & Surety Company, 415 F.2d 809 (8th Cir. 1969); Leather's Best, Inc. v. S.S. Mormaclynx, *supra*; Astor-Honor, Inc. v. Grosset & Dunlap, Inc., 441 F.2d 627 (2d Cir. 1971); Comment, 73 Colum.L.Rev. 153 (1973).

In this litigation, permitting suit against the additional defendants will resolve the entire controversy between plaintiff and all members of the group which exchanged shares under the Agreement, without overburdening the Court. Liability depends here upon the construction of the Agreement and upon the parties' performance of their respective obligations. All of the claims are derived from the same instrument and are identical in all respects. Defendants are represented by the same counsel and their answers are substantially identical, with the exception of an additional affirmative defense of lack of personal jurisdiction over defendant Rose Heller which is resolved below. The apportionment of any recovery against the defendants will not unduly burden this Court since their relative liabilities have been determined in the Agreement. *Cf.* Ciarmitaro v. Woods, 324 F.Supp. 1388 (E.D.Mich.1971).

This appears to be a proper case for the exercise of ancillary jurisdiction. This Court cannot decline jurisdiction to decide the issues tendered with respect to some of the claims, and by asserting jurisdiction over the additional claims, this Court will avoid the need for a duplicate trial to be conducted in state court.

*Venue.*

██ Defendants plead as an affirmative defense that venue does not lie in the Southern District of New York. If venue in this district is proper, it can only be because the cause of action arose

in this district. 28 U.S.C. § 1391(a). The issue of where the claim arose is to be resolved in accordance with the state law of the forum, that is, New York law. Paragon International, N. V. v. Standard Plastics, Inc., 353 F.Supp. 88 (S.D.N.Y.1973); Ryan v. Glenn, 52 F.R.D. 185 (N.D.Ala.1971).

 New York relies upon the "grouping of contacts" as the criterion in contract litigation. Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954); Intercontinental Planning, Ltd. v. Daystrom, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969); Paragon International, N. V., supra. See also Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965). See also, Jimenez v. Pierce, 315 F.Supp. 365 (S.D.N.Y.1970).

 Negotiation of the Agreement took place in New York. (Affidavit of Walter Barthold, Esq., sworn to April 30, 1974, ¶ 4). The principal purpose of the contract was the exchange of all of the shares of William Heller, Inc., a New York corporation having its principal place of business in the Southern District of New York. (Agreement, Ex. 1 to Complaint, Preamble). When the Agreement was executed in 1965, all of the defendants were living in the Southern District of New York and the plaintiff corporation had its principal place of business there. (Affidavit of Mr. William J. Palmer, sworn to March 21, 1974, ¶¶ 4, 20 and Ex. A thereto). The Agreement was made subject to New York law. (Agreement, ¶ 31). The letter from defendant Benjamin Heller to D. J. Grace of Uniroyal, dated September 18, 1970, which Uniroyal alleges effected the alleged breach of contract sued on here, was sent on the letterhead of William Heller, Inc. with a New York City address. (Ex. I, Affidavit of Walter Barthold, Esq.).

Defendants contend that the claim arose in New Jersey because the contract was executed there, and because

that state was selected as the site for Subsequent Closings. No event actually occurred in New Jersey after the First Closing, but specific actions were taken by both sides of the controversy in New York both before and after that event. In view of the aforementioned contacts with the Southern District of New York, venue properly lies in this District.

*Lack of Personal Jurisdiction over defendant Rose Heller.*

 Personal service was effected on defendant Rose Heller in Florida, where she now resides. Rule 4(e), F.R.Civ.P. permits such service to the extent that state law would permit such extraterritorial service under the circumstances of this case. Such service is authorized here by New York CPLR §§ 313, 302(a)(1), which provides for extraterritorial service to obtain personal jurisdiction over a non-domiciliary.

> "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary . . ., who in person or through an agent:
> 1. transactions any business within the state; . . . ."

[CPLR § 302(a)(1)]

A single transaction is sufficient to confer jurisdiction under this statute. Applying the statutory language to an action on a contract, it has been held that the "[m]ere execution of a contract in New York, without more, is insufficient to constitute transaction of business as is mere negotiation; negotiation or execution plus other contacts, however, may suffice." Impex Metals Corp. v. Ormet Chemical Corporation, 333 F.Supp. 771, 774 (S.D.N.Y.1971). "Generally, it is held that substantial negotiations for a contract are a sufficient predicate for the assertion of . . . jurisdiction even though the contract is culminated elsewhere." Karlin v. Avis, 326 F.Supp. 1325 (S.D.N.Y.1971). See also, American Eutectic Welding Alloy

Sales Co. v. Dytron Alloys Corporation, 439 F.2d 428 (2d Cir. 1971); Liquid Carriers Corporation v. American Marine Corporation, 375 F.2d 951 (2d Cir. 1967); ECC Corporation v. Slater Electric, Inc., 336 F.Supp. 148, 152 (E.D.N.Y.1971); Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., *supra*; 1 Weinstein, Korn & Miller, New York Civil Practice § 302.06a. The non-domiciliary defendant need not have been physically present in New York to have transacted business for purposes of CPLR § 302(a)(1); it is sufficient if the defendant's agent is present and engages in purposeful activity on his behalf. Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970).

Defendant Rose Heller was a resident of New York at the time that the Agreement was negotiated. The Agreement was negotiated in New York and Mrs. Heller was represented by New York counsel. The parties selected New York law as that governing the contract. Although it has been held that designating New York law as the law governing the contract will not alone permit recourse to § 302(a)(1) of the CPLR, it is a significant contact with this state. See Agrashell, Inc. v. Bernard Sirotta Company, 344 F.2d 583 (2d Cir. 1965). The Agreement involved the exchange of all of the stock of William Heller, Inc., a New York corporation. In this transfer, Mrs. Heller availed herself of the protection of New York law. International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). From all of the foregoing, defendant Rose Heller's affirmative defense of lack of personal jurisdiction lacks merit. She was served properly for this Court to obtain personal jurisdiction.

*Statute of Limitations.*

As a matter of discretion, the Court declines to reach the question of limitations in the absence of a full trial record. Whether the cause of action accrued in January 1968, when Uniroyal adopted a pension plan for the employees of William Heller, Inc., or later, when the final Subsequent Closing was to be held, in 1970, is reserved. At this time, it is also premature to determine whether the Agreement should be considered one for the sale of securities subject to § 2–725 of the New York Uniform Commercial Code, imposing a four year limitation, or a contract not within Article 2 of that Code, and therefore subject to a six year statute of limitations under New York CPLR § 213. *Cf.* Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed. 2d 458 (1962).

*Claimed Failure to State a Claim Because of Failure to Plead Performance of a Condition Precedent.*

Defendants contend Uniroyal cannot recover in this action because it failed to perform conditions precedent to their obligation to make payment. Paragraph 18 of the Agreement, provides:

"18. If [William] Heller [Inc.] shall institute a pension plan covering the employees listed on Exhibit D their successors in such positions or other persons in similar positions with Heller, Pawtuxet, or Knitting, or if UniRoyal shall arrange for the inclusion of such employees in a pension plan of UniRoyal, then at each Subsequent Closing following the institution of such plan by Heller or the inclusion of such employees in such UniRoyal plan, the Shareholders, pro rata, in the percentages to be shown, as provided in Paragraph 25, opposite their names in Column 4 of Exhibit A, will pay to UniRoyal in cash the amount of any cost to Heller or UniRoyal, as appropriate, during the previous year of funding or accruing of such pension plan in respect of such employees, the aggregate amount of such payments not to exceed seventy thousand dollars ($70,000), but, in the case of the final Subsequent Closing, the

Shareholders shall also pay to UniRoyal any amount by which the total of all such payments then and theretofore made is less than $70,000; and, if a pension plan has not been so provided for such persons prior to the final Subsequent Closing, at such final Subsequent Closing, the Shareholders shall, pro rata, in such percentages, pay to UniRoyal $70,000."

Defendants contend that the holding of Subsequent Closings in accordance with Paragraphs 6.2 and 6.3 of the Agreement and the establishment of a pension plan, or at least Uniroyal's good faith effort to establish such a program by the final Subsequent Closing, were conditions precedent. (Answer to Interrogatory No. 7, sworn to by Benjamin Heller and William Heller on December 17, 1973).

 It is evident from the plain and unambiguous language of Paragraph 18 that the establishment of a pension plan was not a condition precedent. Paragraph 18 expressly provides that "If a pension plan has not been provided for such persons prior to the final Subsequent Closing, at such final Subsequent Closing, the Shareholders shall . . . pay to Uniroyal $70,000."

"Unless a contract is ambiguous or vague in its terms the intention of the parties must be gleaned from the four corners of the instrument. A court may not rewrite into a contract conditions the parties did not insert. The intent of the parties must be distilled from the terms of the written agreement itself." Frankel v. Tremont Norman Motors Corp., 21 Misc.2d 20, 193 N.Y.S.2d 722, 725 (Sup.Ct.1959), aff'd per curiam, 10 App.Div.2d 680, 197 N.Y.S.2d 576 (1st Dept. 1960).

When the parties entered into the Agreement, it was hoped that the Heller enterprises would earn substantial net operating income for Uniroyal. If the consolidated net operating income exceeded a specified amount, the Agreement provides for payment to defendants at Subsequent Closings of additional consideration for the Exchange, in the form of Uniroyal shares (Agreement ¶¶6.2–6.3). The formula fixing such additional consideration provided that, until such time that a pension plan was instituted, the number of such anticipated additional shares the defendants would receive would be reduced by a value "equal to actuarially appropriate annual current costs" of such a pension program. [Agreement ¶6.3(A)(ii)(d)]. Until that time, but prior to the final Subsequent Closing, defendants were not obligated to make payments toward the funding at some future time, of any pension plan. (Agreement ¶18). If a pension plan were adopted, the basis for reduction of the subsequent payments in Uniroyal shares would cease but defendants would be required to pay Uniroyal for the actual cost of the plan, not to exceed $70,000. (Agreement ¶18).

No Subsequent Closings were held. No additional Uniroyal shares were transferred to the defendants because the Acquired Companies earned insufficient net operating income to require such additional payment.

Defendants now contend that their obligation to fund a pension plan was conditioned on the holding of these Subsequent Closings and the receipt of the shares.

The Agreement expressly provided that the entire contract was subject to the condition that the First Closing take place before June 1, 1965. (Agreement ¶3). In describing the holding of Subsequent Closings, the Agreement clearly uses words of promise rather than language of a condition. (Agreement ¶6.1). No transfer of additional shares was promised, since this added consideration was intended to be, and was made contingent upon the future profitability of the Acquired Companies. (Agreement ¶6.2). Nor was the transfer of additional shares a condition; there is no reference to the transfer of shares in

Paragraph 18 which creates the obligation to pay.

■ The issue remaining is whether it was a condition for payment that the final Subsequent Closing be held, although no shares would be transferred. Paragraph 6.1 of the Agreement states that "Subsequent Closings . . . shall be held in each of the five years following 1965." If the promise to pay in Paragraph 18 was dependent on the performance of the promise to hold a final Subsequent Closing, it would constitute a condition.

> "If parties intend that a debt shall be contingent . . . then it will be so held by the Court. If, on the contrary, they intend that the debt shall be absolute, and fix upon the future event as a convenient time for payment merely, . . . then the debt will not be contingent; and, if the future event does not happen as contemplated, the law will require payment to be made within a reasonable time." DeWolfe v. French, 51 Me. 420 (1864); quoted in 5 Williston on Contracts [3d ed.] § 799, at 817.

The leading New York case of M. O'Neil Supply Co. v. Petroleum Heat & Power Co., 280 N.Y. 50, 19 N.E.2d 676 (1939), recognizes such distinction. There, a prime contractor promised to pay a supplier five days after the completion of the work by a sub-contractor. When the sub-contractor did not complete the work, the prime contractor did so, but refused to pay the plaintiff. The Court, rejecting the contention that completion of the work by the sub-contractor was a condition precedent, stated:

> "We think that here it could be found that it was the intention of the parties that the debt should be fixed and absolute and that the condition concerning payment attached solely to the event of completion of work, the happening of which established a convenient time of payment." 280 N.Y. at 54, 19 N.E.2d at 678.

In the case at bar, the parties set a convenient time and place for payment. In making such selection, they anticipated that at some time the exchange agreement would be completely performed. Accordingly, they agreed to set the final Subsequent Closing as that time. In doing so, the parties allowed Uniroyal time considered sufficient, within which to develop a pension plan and determine the cost thereof. Defendants' liability was absolute, but payment was to be deferred until the cost was known, but in no event later than the final Subsequent Closing.

■ Conditions are not favored, and, in the absence of unambiguous language, will not be found by the Court. 5 Williston on Contracts § 665. The concept of holding formal Subsequent Closings at which nothing is required to be paid or done seems unlikely to have been intended under this Agreement. If such naked rites were required to be performed, defendants might, assuming any damages resulted, have a cause of action for Uniroyal's failure to perform its promise to hold Subsequent Closings merely for ceremonial purposes. But such failure did not excuse the defendants' obligation to pay. 5 Williston on Contracts § 665.

■ Even if Paragraph 18 makes the holding of a final Subsequent Closing a condition precedent to defendants' obligation sued on here, it is the sort of condition, performance of which " . . . may be excused without other reason if its requirement (a) will involve extreme forfeiture or penalty, and (b) its existence or occurrence forms no essential part of the exchange for the promisor's performance." Restatement, Contracts § 302. See United States to the use of Viglione v. Klefstad Engineering Company, 324 F.Supp. 972 (W. D.Pa.1971). If the holding of the final Subsequent Closing were regarded as a condition, Uniroyal would have forfeited its right to payment. The final Subsequent Closing had no apparent useful

purpose, other than to serve as the meeting time and place to come to a final settlement and delivery of additional shares. Since, as circumstances turned out, no transfer of such additional shares was required, the only item on the agenda would have been the payment of the amount here in controversy.

 Defendants contend that by parol evidence at trial they might establish that their obligation to pay was subject to a condition precedent. In New York, ambiguity in a written agreement may be resolved by parol evidence, notwithstanding clauses such as ¶30[2] U.C. C. § 2–202. Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 110 N.E.2d 551 (1953); Neonex International Ltd. v. Norris Grain Company, 338 F.Supp. 845 (S.D.N.Y.1972). The claimed ambiguity must be such that its clarification has some legal effect, before parole evidence would be admissible. We find no such ambiguity in this Agreement which is of any legal consequence, and therefore need not resort to parol evidence. In Re United Network, Inc., 459 F.2d 556 (2d Cir.), cert. denied, 409 U.S. 916, 93 S.Ct. 238, 34 L.Ed.2d 178 (1972).

*Waiver.*

In their answers to Interrogatory No. 6, defendants explain that they rely on the failure to hold the Subsequent Closing ceremonies, the last of which is discussed immediately above as a condition, and plead such failure as a waiver. As noted above, there was no purpose in holding the Subsequent Closings, except possibly the final one. No waiver is reasonably implied from such failure, nor does such failure evidence any intent to waive. As to the final Subsequent Closing, failure to hold this naked ceremony was excused by the letter of Benjamin Heller dated September 18, 1970, and accordingly may not be relied on as a waiver.

### CONCLUSION

The affirmative defenses pleaded in the various answers based on lack of subject matter jurisdiction, improper venue, lack of personal jurisdiction, failure to perform a condition precedent, failure to state a claim and waiver are dismissed.

Settle Order on notice.

---

2. Paragraph 30 of the Agreement reads as follows:

"30. This Agreement constitutes the entire understanding of UniRoyal and the Shareholders relative to the subject matter hereof."